UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Miami Division

| | |
|---|---|
| **Diedra Faulkner,** ) <br> ) <br> *Plaintiff*, ) <br> ) <br> v. ) <br> ) <br> **Mark Esper, Secretary,** ) <br> **Department of Defense,** ) <br> **Department of Defense Education Activity,** ) <br> ) <br> **Serve:** ) <br> ) <br> **Ariana Fajardo Orshan** ) <br> **U.S. Attorney for the Southern District** ) <br> **of Florida** ) <br> **U.S. Attorney's Office** ) <br> **99 N.E. 4th Street** ) <br> **Miami, FL 33132** ) <br> ) <br> *Defendant.* ) <br> ) | Case No. _____ |

**CIVIL COMPLAINT FOR EQUITABLE AND MONETARY RELIEF
AND DEMAND FOR JURY**

Plaintiff Diedra Faulkner brings this civil complaint against Secretary of Defense Mark Esper, alleging that the Department of Defense Education Activity (DoDEA) is unlawfully discriminating against her based on her relationship to her disabled daughter in violation of the Rehabilitation Act of 1973, 29 U.S.C. 791, *et seq.* (Rehab Act).

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this action pursuant to the Rehabilitation Act of 1973, 29 U.S.C. 791, *et seq*.

2. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because DoDEA is an

agency of the United States government and the majority of the fact witnesses and physical evidence are located in Guantanamo Bay, Cuba.

## PARTIES

3. Plaintiff Diedra Faulkner is domiciled in Stafford, Virginia and works at W.T. Sampson School, a DoDEA school, at the Naval Station Guantanamo Bay, Cuba. Faulkner's daughter—who is listed as Faulkner's dependent and for whom she and her husband are caretakers—has a medically diagnosed disability and is listed as permanently disabled with Social Security and has a military DEERS registered identification card.

4. DoDEA is a civilian agency of the United States Department of Defense that manages schools for military-connected children in the United States and overseas.

## FACTUAL ALLEGATIONS

1. DoDEA offered Faulkner the job of middle school science and math teacher at W.T. Sampson School in Guantanamo Bay, Cuba, in or around June 2014.

2. In or around the same time, DoDEA informed Faulkner that it could include her daughter on her travel orders as long as Faulkner's daughter does not need handicapped accessible facilities.

3. Faulkner's daughter does not need handicapped accessible facilities.

4. At or around the same time, DoDEA informed Faulkner via email that it would take seven days for DoDEA to amend Faulkner's travel orders to include Faulkner's daughter.

5. But DoDEA took over seven months before it added Faulkner's daughter to Faulkner's orders.

6. As a consequence of that delay, Faulkner had to spend several months away from her daughter after Faulkner started her new job in Guantanamo Bay.

7. During the time that Faulkner was away from her daughter, the assistant principal at Faulkner's school, Shelman Burton, attempted to persuade Faulkner to abandon her teaching position, by telling her that if he were in Faulkner's position, he would not stay in Guantanamo if his family was not allowed to accompany him.

8. It was not until on or around March 12, 2015, after Faulkner wrote a letter in or around January 2015 to one of her U.S. Senators, Senator Mark Warner, and Sen. Warner's office submitted an inquiry on Faulkner's behalf, that DoDEA admitted fault and quickly placed Faulkner's daughter on Faulkner's orders.

9. DoDEA has repeatedly treated Faulkner unfavorably in an attempt to force Faulkner to leave Guantanamo Bay.

10. In or around September 2016, a hurricane hit Cuba and all teachers' dependents, even adult children not on orders, were evacuated except for Faulkner and her family.

11. DoDEA left Faulkner and her family on the island, while all other spouses, dependents, and *even pets* were flown by DoDEA to Jacksonville, Florida.

12. Upon the arrival of the evacuated families in Jacksonville, DoDEA ensured that it had paid for the evacuated families' hotel and rental expenses.

13. Further, these families received government compensation for three weeks, which many families used to go on vacation to visit extended family.

14. Meanwhile, DoDEA instructed Faulkner to help with hurricane clean-up on Cuba.

15. At the time, DoDEA did not provide an explanation for why Faulkner and her family were treated unfairly and differently from similarly situated employees and their families.

16. DoDEA supervisory employees on the island who could have gotten Faulkner's daughter off the island were aware of Faulkner's daughter's medical condition and that

additional extreme stress could have caused Faulkner's daughter to be medically evacuated (medevac'd) off the island a few months later.

17. In or around September 2016, DoDEA denied medical orders for Faulkner's daughter to attend a critical doctor's appointment in Virginia to remove a recurring cyst on her leg after the hospital had issued medical orders.

18. In March 2017, Faulkner's daughter had to be medevac'd from Cuba because of an emergency medical situation; and she spent 10 days at Walter Reed Hospital in Maryland where she was stabilized and her medication needs were reassessed.

19. When Faulkner's daughter's treatment was finished and she could return to Guantanamo, Faulkner needed either medical orders or simply travel orders from DoDEA to fly back to the island.

20. Guantanamo requires orders before passengers can obtain a seat on the plane.

21. In or around March 2017, Assistant Principal Veronica Finney sent Faulkner medical orders, but on the same day, DoDEA rescinded the orders.

22. DoDEA's refusal to provide "no cost" orders for Faulkner to return to Cuba delayed Faulkner's arrival for five days.

23. Faulkner was unable to fly back on the original travel date and had to extend her stay for five days at her own expense.

24. In addition, Faulkner had to use additional medical leave to cover these days.

25. In spring 2016, DoDEA transferred a biology and health teacher to a different position and then forced Faulkner to teach the biology class even though Faulkner is not certified to teach those classes.

26. DoDEA had another teacher available, Mr. Lucidi, who was hired and certified to teach high school science while Faulkner was hired as a middle school teacher.

27. Since DoDEA requires teachers to be certified in the classes they teach, DoDEA forced Faulkner to take, and pay for, courses to gain certification for Biology.

28. At the same time, DoDEA had another teacher, Mr. Hikosaka, who was also uncertified to teach the health classes that he assumed. He was not required to be certified to teach the high school courses, nor was he made to pay for and gain certification.

29. But DoDEA forced Faulkner to pay, out of her own pocket, roughly $750, which includes course work, parking registration, and travel to the James Madison University during spring break, for the courses needed to get certified to teach high school biology.

30. Additionally, DoDEA issued Faulkner, and only Faulkner, a letter of deficiency which threatened to remove her from her position within one year if she was not fully certified in biology.

31. In 2017, Faulkner was again assigned to teach a chemistry class—this time in a non-chemistry equipped room.

32. Assigning Faulkner to teach chemistry in a non-chemistry approved room violated OSHA rules and regulations.

33. Other chemistry teachers were assigned to teach chemistry from C12, the designated chemistry room: Mr. Ochinang (in 2017), Mr. Lucidi (in 2016), and Ms. Clark (in 2015).

34. In or around April 2017, a parent of a student who had been placed on a behavioral modification plan verbally threatened Faulkner in the presence of Assistant Principal

Veronica Finney and Debra Fitzgerald, the counselor who is responsible for setting up and attending parent teacher conferences.

35. Although other teachers of record were involved with this student's behavioral modification plan set up by Ms. Fitzgerald, Faulkner was the only one commanded to attend the meeting.

36. During the meeting, the parent threatened Faulkner; Faulkner left the meeting and filed a police report.

37. Faulkner informed Finney of a series of harassing phone calls Faulkner had received from this parent.

38. Neither Finney nor the conference facilitator and counselor, Ms. Fitzgerald, did anything to intervene on Faulkner's behalf.

39. Throughout Faulkner's tenure, from September 2015 to the present, several of Faulkner's supervisors (including Shelman Burton, Jenny Reese, and Emilio Garza) attempted to influence Faulkner to resign by telling Faulkner that she needed to leave.

40. In late spring 2018, Mr. Garza, the principal, removed Faulkner from her teacher-leader position and Continuous School Improvement Chair position without explanation, even though Faulkner had received an excellent performance rating.

41. Garza removed Faulkner from her teacher-leader position after a false allegation by the School Supply Assistant, Melissa Robinson, that Faulkner had stolen expensive equipment from Ms. Burkhardt's room.

42. Although Garza wrote in an email that this false allegation should not have been made, he still removed Faulkner from her leadership positions.

43. The false allegation against Faulkner was intentionally sent out to the DoDEA community, including people and non-DOD employees in Guantanamo Bay, the Superintendent's office in North Carolina, and Europe, damaging Faulkner's reputation.

44. In late January 2018, Faulkner broke her ankle at the school due to a broken concrete sidewalk.

45. Garza refused to allow her to take leave for therapy and doctor's appointments, citing an alleged lack of available substitute teachers.

46. While Faulkner was on crutches as her broken ankle healed, her classroom was vandalized three times.

47. When another teacher, Anne Hawkins, broke her leg, DoDEA gave her 45 days of leave; Faulkner was not granted the same treatment.

48. In the spring semester of 2018, Garza charged Faulkner a half day of leave for each of the 45-minute appointments for physical therapy Faulkner needed as a result of Faulkner's broken ankle.

49. Garza only allowed Faulkner to take one hour of leave (during her planning period and lunch break).

50. Garza charged Faulkner four hours of leave instead of the one hour that she actually took.

51. In May 2018, Faulkner led a lab exercise that included the use of acetic acid and baking soda.

52. This exercise creates a reaction that causes the acid to spew into the air, so she directed all students to wear safety goggles.

53. One student refused to wear the required goggles.

54. The aide for the student left the class and was not available to remove the student to a safe area even though the student was supposed to receiving services during science; Faulkner thus instructed the student to leave the classroom.

55. Assistant Principal Finney came to Faulkner's classroom to ask why the student was removed from Faulkner's classroom; Finney asked Faulkner to leave Faulkner's students in the lab unsupervised to discuss the matter.

56. Faulkner refused to leave her classroom because there were fifteen sixth graders performing a lab exercise with acetic acid.

57. Garza and Finney reprimanded Faulkner, in writing, for being "unreasonable" in refusing to leave her students unsupervised and alone in the lab during the experiment.

58. All teachers except Faulkner received their class schedules for the 2018-2019 school year by the end of May 2018.

59. In or around May 2018, an unknown DoDEA employee caused a chemical spill int the chemical stockroom.

60. In or around June 2018, one of the teachers at the school, Ms. Burkhardt, demanded that the fire department be called so that she could block access from Faulkner's room to a second emergency room exit.

61. When the Fire Department arrived, firefighters advised that the door from Faulkner's room should not be locked or blocked, to allow easy access to fire exits, since that is how the building was designed and built in the 1950s..

62. When Finney saw the spill in the chemical stockroom, she asked Faulkner why Faulkner did not clean it up.

63. Faulkner did not know what chemicals had been spilled, when they were spilled, or whether the spill was dangerous.

64. Finney repeated the question to Faulkner multiple times before the fire department chief explained that if he were to walk in and see a spill like that, he would close the school down.

65. The 2018-2019 school year is the second year in a row when Faulkner has not been assigned classes before the end of the prior year.

66. Not being assigned classes makes it impossible for a teacher to plan in advance and it causes a great deal of work and stress to get caught up when classes are not assigned until close to the start of the new school year.

67. No planning for laboratory materials used for experiments can be made when a science teacher is assigned a class in September rather than April. Since there are no vendors in Cuba who will ship the live materials and items at the last minute, lab experiments that are in the textbook ordered by DoDEA cannot be performed. A science teacher, such as Faulkner, who is disadvantaged by not receiving her new class schedules by the end of May is forced to scramble at the last minute to order and purchase materials out of her own pocket to meet the 30% lab requirement of DoDEA.

68. On September 13, 2018, Faulkner applied for leave because, after five years of Faulkner being stationed in Cuba and getting her daughter's required medication from the pharmacy, the pharmacy was no longer carrying her daughter's required medication.

69. Faulkner's daughter's doctor, Lt. Commander Osborne, wrote a prescription for the required medication for Faulkner's daughter for Faulkner to pick up in Jacksonville, Florida, along with a medical note to excuse Faulkner for the time needed to acquire the medication.

70. Instead of permitting Faulkner to take leave for the trip to pick up the required medication for her disabled daughter, Garza called Lt. Edwards, the Department Head for Behavioral Health at the Guantanamo Bay Naval Hospital, purportedly to determine if Faulkner's daughter "really needed" the medication.

71. Garza was already aware of Faulkner's daughter's disability.

72. Garza then told Faulkner that Lt. Edwards said that she was not aware of a medication that would require Faulkner's daughter to need emergency medical orders.

73. Garza also told Faulkner that instead of getting the medication, Faulkner should have her daughter evaluated in an emergency room.

74. Garza then emailed Faulkner, saying that he had spoken with the personnel at the hospital—who had given Garza personal and confidential medical information, including the type of medication that Faulkner's daughter was taking—without Faulkner's consent.

75. Garza intimated that Lt. Edwards had said that she was not "aware" of any psychotic medicine that constitutes a medical emergency, incorrectly implying that Faulkner's daughter could go without her medicine.

76. Throughout October 2018, Finney harassed and retaliated against Faulkner by holding her to different standards than other similarly situated employees, and she did so in an attempt to coerce Faulkner to quit her job.

77. On or around October 12, 2018, Finney falsely accused Faulkner of not having her lessons plans in an easily accessible place, and for teaching an unapproved class.

78. Finney demanded to see Faulkner's "A day" plan book (which was on Faulkner's desk).

79. When Faulkner provided the "A day" plan book, Finney said she "needed the 'B day' plan book now!"

80. Faulkner had been taking her plan book home at the end of each day because students had somehow gained access to quiz and test materials and she did not want to leave her plan books inside the classroom.

81. Faulkner's husband was forced to leave their disabled daughter home alone to retrieve the plan book, which disrupted Faulkner's daughter's daily schedule.

82. Finney eventually admitted that Faulkner's plans were accessible.

83. Finney also eventually admitted that Faulkner was teaching an approved class.

## COUNT I
### Unlawful Disability Discrimination Based on Association
### The Rehabilitation Act of 1973, 29 U.S.C. 791, *et seq*.

84. Faulkner's daughter, who is Faulkner's dependent, has a disability that is registered with Social Security and the military DEERS system, with a dependent ID card.

85. Throughout the time Faulkner was applying to work at Guantanamo Bay, and during the several years she has worked in Cuba, DoDEA and Faulkner's direct supervisors in DoDEA were aware of her daughter's disability.

86. DoDEA has repeatedly treated Faulkner differently and adversely because of her relationship to and association with her disabled daughter.

87. By denying Faulkner's requested leave, altering her work responsibilities, requiring her to pay for the necessary certifications to remain employed after those alterations, failing to evacuate her and her family during a hurricane, and subjecting her to constant harassment by DoDEA leadership in an attempt to coerce into resigning, DoDEA has subjected Faulkner to a series of adverse employment actions.

88. DoDEA has taken these adverse actions against Faulkner based on her association with her disabled daughter.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Diedra Faulkner respectfully requests that the Court enter judgment in her favor and award to her the following relief:

A. Judgment against Defendant DoDEA in an amount of any wages, salary, employment benefits, or other compensation denied or lost to Faulkner, including economic damages, liquidated damages, and compensatory and punitive damages to be determined at trial;

B. Re-employment, reinstatement, promotion, front pay, or other equitable relief;

C. Pre-judgment interest;

D. Interest due on unpaid wages;

E. A reasonable attorney's fee and costs of this litigation;

F. Reasonable expert witness fees; and

G. Any other relief that this Honorable Court deems just and proper to award.

## JURY DEMAND

Plaintiff demands a jury for all issues proper to be so tried.

Dated: August 23, 2019                     Respectfully submitted,

 /s/ R. Scott Oswald
R. Scott Oswald, FL Bar No. 158437
John T. Harrington (to be admitted *pro hac vice*)
The Employment Law Group, P.C.
888 17th Street, N.W., 9th floor
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
tharrington@employmentlawgroup.com
*Counsel for Plaintiff*